The opinion of the court was delivered by
Watkins, J.
The present litigation grows out of the liquidation of the Bank of Commerce and comes to this court by an appeal from a judgment of the District Court sustaining an opposition of depositors to a provisional account of the liquidating commissioners, reducing certain charges and fees in favor of the commissioners, notary and attorneys.
The account shows the following receipts which the liquidating commissioners propose for distribution amongst the various depositors, pra rata, viz.:
*1062 Received of officers of the bank from paying teller. $8,529 48
Received of officers of the bank amounts deposited in Louisiana National Bank. 6,126 6*2
Collections on demand loans. 65,268 70
On loans and discounts. 61.222 29
From sundry banks and bankers . 2,851 76
On individual deposits. 42,117 89
Interest . 1,056 44
From Fourth National Bank of St. Louis. 888 80
From Chase National Bank, New York.1. 294 25
From salé of a State bond . 100 50
From Firemen’s National Bank, Boston. 64 04
From cashier Chase National Bank. 1,236 04
Total.$189,746 81
And from that sum the accountants propose to make the following disbursements; and to these allowances various depositors of - the bank make oppositions.
For the purpose of being accurate, we have made the following extract from the brief of appellant’s counsel, viz.:
“ Among the liabilities appeared the following charges:
“ E. H. Reynes and R. G-. Bush, liquidators, their commission to date, five per cent, on $189,746.31 . $9,487 31
“ Clegg and Quintero and Chas J. Theard, attorneys of the liquidators, to date. 12,500 00
“W. C. Dufour, notary, for inventory and all services. 750 00
“ Various ordinary creditors opposed the first two items. Some opposed also the notary’s fees, bub subsequently withdrew their opposition.
“The lower court rendered judgment, allowing the liquidators only two thousand dollars (one thousand dollars each); the attorneys five thousand dollars, and the notary one hundred and twenty-one dollars and sixty-five cents.”
The opponents’ counsel have made no answer to the appeal, and have requested no amendment to the judgment, consequently the only question to be determined is whether the allowances made should be increased or maintained in statu quo.
The question principally discussed at the bar and in the briefs of counsel is whether the provisions of Revised Statutes, Sec. 294, or those of Sec. 284, should control our decision — those of the former limiting the salary of bank liquidators to a sum not in excess of two thousand five hundred dollars, whilst those of the latter make no special provision on the subject of salary or fees, thus making the amount to be awarded in each case to depend upon the facts of the case, and to rest upon the judge’s discretion.
Section 294, R. S., seems to have direct reference to proceedings taken for the liquidation of banks which fail to redeem their circu *1063 lating notes issued by authority of the State, and countersigned by the auditor. The proceedings contemplated are those which are to be set on foot by the Attorney General; and if liquidation follow, it is made the duty of the court to appoint not less than three liquidators.
Counsel for the liquidating commissioners have reproduced in their brief the 284th section of the Statutes and the corresponding article of the Civil Code, under the authority of which the proceedings were undertaken for the liquidation of the bank, and for the purpose of accuracy we have quoted them as followss:
“ Section 284 of the Revised Statutes is as follows:
“ ‘ Every banking company established under this act shall, on proof of an act of insolvency or non-compliance with any of the conditions of this act, forfeit its corporate rights, and it shall be the duty of the District Court of the district in which such corporation is situated, at the instance of any creditor, or of the Auditor of Public Accounts, and on proof of the alleged facts, to decree such forfeiture, and to appoint thereupon commissioners to effect the liquidation of the affairs of the corporation; to convert into cash, as speedily as may be, under the direction of the court, all the assets of the corporation, including the sum that may have remained unpaid by stockholders upon their respective shares of the capital stock, and, after providing for any unpaid balance which may be due to the bill holders, to distribute the same as now provided by law in case of insolvencies of individuals.’ ”
Then follows Art. 447 of the Civil Code, as a law in pari materia, viz.:
“A corporation legally established may be dissolved. By the forfeiture of its charter, when the corporation abuses its privileges, or refuses to accomplish the conditions on which such privileges were granted, in which case the corporation becomes extinct by the effect of the violation of the conditions of the act of incorporation.”
Our learned brother seems to have accepted the counsel’s theory, and placed a like interpretation upon the foregoing, provisions of the statutes, and in this opinion we concur.
With regard to the amounts which the commissioners have placed upon their account, counsel point to the fact that the liquidation was commenced at a time of great public excitement, which had been superinduced by several bank suspensions in the city of New Orleans; *1064 and that an investigation of the books and affairs of the Bank of Commerce revealed its condition to be not less deplorable than that of the public mind — everything being in confusion and disorder only a little short of chaos. Hence, the contention is that the task set before the commissioners and their attorneys was an uncommonly difficult one.
But, while conceding at once the correctness of this statement, we have the.response from the other side, that the account tendered is only a provisional one, embracing only three months’ services; and that in the hopelessly insolvent condition of the bank, the loss of the depositors should, as far as practicable, be minimized.
Our learned brother of the District Court prepared an elaborate statement of his reasons for judgment, and reduced same to writing and filed it with the record. An examination of them discloses that he gave the subject serious and careful study, and brought to bear upon its analysis great labor and research.
On the part of the opponents perfect satisfaction therewith is expressed, and it is reproduced as a part of their brief; andón the part of the appellants no error of law or fact is pointed out — their counsel seeming to content themselves with the suggestion that the allowances made in the judgment are too small.
A careful examination and study of the record and an attentive consideration of the arguments of counsel have brought our minds to the same conclusion at which the judge a quo arrived.
In our opinion, he made a full and very liberal allowance to commissioners and lawyers for the work performed, under the circumstances stated, and more than we should allow if the allowance was open to review. Consequently we reproduce in its entirety the opinion of the District Judge and make it a part of the opinion of this court, viz.:
REASONS FOR JUDGMENT.
“The liquidating commissioners, Mr. Emile H. Reynes and Mr. Reuben G. Bush, have filed their first account of their administration of the insolvent Bank of Commerce. Every item of expense upon the account is opposed by various depositors who are recognized creditors.
“They particularly oppose the commissions of the liquidators, nine thousand eight hundred and forty-seven dollars and thirty-one cents; the fees of their attorneys, the firm of Messrs. Clegg & *1065 Quintero and Mr. Charles J. Théard, to date, twelve thousand five hundred dollars; the fee of Mr. John St. Paul, attorney for the absent creditors, to date, one thousand dollars; the fee of Mr. W. 0. Dufour, notary public, for making an inventory and all services, seven hundred and fifty dollars, and the fees of Mr. Dreifus and Mr. Molloy, the appraisers, five hundred dollars.
“The depositors oppose on the ground that the above charges are excessive and illegal, and exhibit a most expensive administration of the affairs of the insolvent bank, which the court should not allow.
To decide the issues presented it is necessary to state the case.
“ The Bank of Commerce was organized under the laws of the State with a capital of one hundred thousand dollars. It was intended to be and became a bank for small depositors, and it occupied a position .in the business community, between the savings banks and the large banking corporations. It transacted a banking business for several years, with a force consisting of a president, cashier, paying teller, receiving teller, two book-keepers, a runner, three clerks and a porter, at a total annual expense of twelve thousand two hundred and twenty dollars.
“ The bank suspended payment on the 11th day of September, 1896, owing to its two thousand one hundred and forty-three depositors four hundred and seventy thousand four hundred and seven dollars and four cents.
“On the day of its suspension Mr. P. St. Amand, a depositor, individually filed a petition in the Civil District Court, alleging that his check upon his deposit account in the bank had been protested for non-payment, and praying that its charter be forfeited; that its affairs be liquidated by three commissioners appointed by the court; that an inventory and appraisement of the property be made, and that an attorney to represent the absent creditors and stockholders be appointed.
“ At the same time the bank, through its attorneys, Messrs. Carroll & Carroll and Clegg & Quintero, filed an answer, in which it admitted it had suspended payment, and submitted the case on the evidence presented by the plaintiff. The court at once rendered judgment forfeiting the charter and appointing two commissioners.
“ The commissioners gave bond in the sum of ten thousand dollars each, received their letters as liquidating commissioners, andón *1066 the 14th day of September, 1896, commenced to discharge their duties.
“ On September 14 the commissioners appeared in court through their attorneys, the firm of Olegg & Quintero, and Mr., Ohaiies J. Théard, and petitioned the court for the appointment of a notary and appraisers, and the appointments were made.
“ On the 21st day of December they petitioned the court for authority to employ an expert accountant. The court authorized them' to do so, limiting the.expenses to $100 per month. The commissioners, on their petition, were further authorized to employ three clerks and a boy, at fixed salaries, to assist them with the books and in the clerical work of the liquidation. The commissioner employed, Henry Daspit, an expert accountant, Mr. Bourgeois, Mr. Moss, Mr. Reynes, Jr., clerks, a boy to run errands and a porter.
“ When the commissioners took charge of the bank they found its books and papers in great confusion. It was impossible to ascertain from the books its debtors and creditors. Some of the books had not been balanced for four or five years. Mr. Daspit, assisted by two clerks, balanced the books of the bank, checked up and balanced each account and the bank books of the depositors, and made, under the directions and with the assistance of Mr. Reynes, a book called the portfolio or discount credit book showing the notes and other obligations held by the bank.
“ This work was completed within six weeks from the date of Mr. Daspit’s appointment, and the commissioners ascertained the exact condition of the bank, and experienced thereafter no difficulty when referring to the books for information. Besides doing all the clerical work from the time of their appointment, the expert and the clerks prepared a complete list of the depositors, with the amount due, divided among them the declared dividend of fifteen per cent, and drew the checks, which the commissioners signed, for the amount due to each depositor. This work was completed on the 30th day of December, 1896. Before or about that time all the employees except Daspit, a boy to run errands and a porter, were discharged. To these employees, for all the services they rendered, from the date of their employment to the filing of the account herein, the commissioners have paid seven hundred and fifteen dollars.
“ When the commissioners took charge of the bank they received *1067 from its officers fourteen thousand sis hundred and fifty-six dollars. The assets consisted principally of overdrafts by depositors, demand loans, notes and bills discounted, and cash on deposit in banks in other States.
“ One of the commissioners, Mr. Reynes, devoted his time exclusively to the collection of these assets and to the general liquidation. He was at the bank all the time during business hours, and often at night. The course adopted to make collections was for him or Mr. Daspit to write letters to the debtors of the bank demanding payment. When the debtors called Mr. Reynes would receive payment in full, or on account, and grant time. If the debtors did not call, sometimes he would go to them personally, and when they did not, after these demands, pay, he referred the claim to his attorneys.
“The other commissioner, Mr. Bush, consulted and advised with Mr. Reynes as to the liquidation of the bank daily. ¡ Also with the attorneys in reference to a claim against the president of the bank, and against the Esperanza and Ohoupique plantations. Nothing has yet been realized directly from the claim, or the plantations, and neither figures upon this account. The money collected by the commissioners was at first deposited in the Louisiana National Bank.
“ It appears that a few days before the Bank of Commerce failed it borrowed from the New Orleans Clearing House sixty thousand dollars, and for its payment the bank pledged notes as collateral security received and held by it, given by customers who had borrowed money or were otherwise indebted. The pledges thus given exceeded the amount borrowed.
“ After the failure, the Clearing House constituted the Louisiana National Bank its agent for the collection of this debt, and for that purpose placed the collaterals in its possession. The Louisiana National Bank collected on account of this debt twenty-six. thousand dollars, and the commissioners, having collected a sufficient amount, paid to the bank the balance due, thirty-four thousand dollars, extinguished the debt and received into their possession the balance of the collaterals.
“ As the commissioners never held the notes and other obligations given by the Bank of Commerce to the Clearing House as security for its loan, and as they were held by the Louisiana National Bank, and when they fell due were paid by the debtor at and to the Louis *1068 iana National Bank, the amount thus received, twenty-six thousand dollars, is not money collected by the commissioners, although it was so paid with their knowledge and consent. Nor did the Louisiana National Bank, from the fact that the commissioners had a deposit account with them and the payments on the loan made were with their knowledge and consent, become their agents, and as their agents collected said amount.
“The commissioners also paid debts due to the New Orleans branch of the Comptoir National d’Escompte de Paris for eleven thousand nine hundred and ninety dollars and seventy cents, and Bobet Bros, for fifteen thousand dollars, both secured by collaterals in excess of said amounts, and obtained possession of the collaterals so pledged.
“Excluding the amount of money found in the bank when they took charge, fourteen thousand sixhundred and fifty-six dollars, and the twenty-six thousand dollars collected by the Louisiana National Bank, the commissioners have collected the sum of one hundred and forty-nine thousand andninety dollars and thirty-one cents. The commissioners have correctly placed upon the credit side of their account the money collected by the Louisiana National Bank and the money received by them from the officers of the Bank of Commerce, which, together with their collections, amount to one hundred and eighty-nine thousand seven hundred and forty-six dollars and thirty-one cents. They have also placed on the debit side of the account the debt due the Clearing House Association, sixty thousand dollars, which, together with the other debts and charges on the debit side, including the expenses of their administration, amount to one hundred and fourteen thousand seven hundred and twenty-nine dollars and ninety-one cents. The difference between these amounts is the balance on the account for the distribution among the depositors, and is seventy-five thousand and eighteen dollars and forty cents.
“ The attorneys advised the commissioners from the time of their appointment as to the manner of liquidating the bank on all legal questions arising in the liquidation, attended to all legal business referred to them, and to all the litigation in court. They were daily at the bank, often at night, consulting with the liquidators and . directing the liquidation. They obtained all necessary information of its condition, and did all that was necessary out of court to secure *1069 the claims of the bank. To that end they obtained from two debtors, Mr. W. P. Nicholls and Mr. Frank L. Gordon, confessions of judgments and promptly recorded the judgments thus obtained in the parishes where their real estate was situated. They made demands, in writing or in person, upon debtors of the bank, on claims referred to them by the commissioners. They endeavored by judicious advice to assist the commissioners in collecting the assets as fast as possible, without resorting to'the courts.
“They appeared in court and successfully defended the following rules against the commissioners, filed in this court:
“ Teutonia Savings Bank, to recover two checks, one for one hundred and forty-six dollars and thirty cents and one for two dollars and seventy cents, deposited before the failure of the bank and not collected, and the sum of four hundred and fourteen dollars and fifty-two cents deposited on the last day before the failure and alleged to have been kept separate from the other funds of the bank.
“ Gideon Townsend & Oo., to recover four hundred dollars in cash, and four checks, one for four hundred and ninety dollars, one for three hundred dollars, one for two hundred and twentydollars, and one for fifty-one dollars and twenty-eight cents, deposited before the failure and alleged to have been kept separate from the other funds of and not belonging to the bank.
“ The Fink Asylum, to recover, on the same grounds, a cheek for one thousand dollars, deposited before the failure of the bank.
“The rule of W. C. Williams & Brother, to pay with their deposit a note held by the bank for seventy-five dollars, signed by W. O. Williams, and secured by a pledge of one share of homestead stock.
“ To these rules, aggregating the sum of three thousand one hundred dollars and ten cents, answers were filed, and they were tried and argued together by the attorneys for the commissioners and the attorneys for the absent creditors.
“ The attorneys have also filed the following suits allotted to other divisions of the court:
“Liquidators of the Bank of Oommerce vs. Marks Goodman. A suit to recover two hundred and thirty-nine dollars and twenty-nine cents, the amount of defendant’s overdraft of his deposit account.
“Liquidators vs. W. P. Nicholls. A suit for one hundred and *1070 twelve thousand four hundred dollars, and for said amount the defendant, upon the day the suit was filed, confessed judgment, and a judgment was rendered accordingly.
“Liquidators vs. Frank McGloin et al. A suit upon a promissory note, signed by defendant and endorsed by George W. Young, for four hundred and fifty dollars. An answer was filed to this suit, in which the defendant, Judge Frank MeGloin, pleaded in compensation so much of a deposit of seven hundred and forty-five dollars and fifty-five cents, in his name as agent, but alleged to be his money, as would pay said note. The case was tried and argued by the attorney for the liquidators, and a judgment rendered in favor of the plaintiffs, as prayed for, against both defendants. From this judgment the defendants have appealed.
“Liquidators vs. E. L. Simonds and the Gordon Cooperage Company, Limited. A suit on a promissory note for one thousand two hundred dollars. No answer was filed, and a judgment was rendered, as prayed for, by default. The defendants havesince paid the amount due.
“Liquidators vs. New Orleans Cotton Seed Oil and Manufacturing Company. A suit on a. promissory note for seven thousand four hundred dollars.
“Liquidators vs. Lawler & Chaery. A suit on a promissory note for two thousand three hundred and thirty-seven dollars and fifty cents.
“Liquidators vs. Frank L. Gordon. A suit on promissory notes for thirty-seven thousand five hundred dollars, secured by a pledge of collaterals. The defendant confessed judgment as prayed for, and judgment was rendered accordingly.
“Liquidators vs. New Orleans Stave and Heading Company. A suit on a promissory note for five thousand one hundred and seven dollars.
“Liquidators vs. William G. Brothers. A suit for a balance of one thousand dollars due on a promissory note secured by a pledge of collaterals.
“Liquidators vs. P. M. Mayer. A suit on a bill of exchange for one hundred and twenty-five dollars.
“ Liquidators vs. Robert J. B. Osborn. A suit on a promissory note for three hundred and eighty-five dollars. No answer was filed, and a judgment was rendered as prayed for by default.
*1071 “Liquidators vs. Hy. Marx et al. A suit on a promissory note for one hundred and sixty-four dollars and twenty cents.
“Liquidators vs. Albert Donnaud and James A. Brennan. A suit on a promissory note for two hundred and fifty dollars.
“Liquidators vs. S. H. Burns et al. A suit on a promissory note for one thousand five hundred dollars.
“ The attorneys filed an intervention in the case of Taylor vs. Almada, claiming the dissolution of an attachment and that the money attached to the extent of four hundred and twenty-five dollars be applied to the payment of a promissory note for that amount held by the bank.
“ They appeared in a rule, taken by the attorney for the absent creditors, to deposit the funds collected, in the judicial'depository, obtained a few orders necessary for the administration, filed the account of the liquidators, and obtained a judgment approving the same in so far as not opposed.
“ For all the services rendered, three members of the bar testified that the fee charge was reasonable.
“The evidence is conclusive, and it is conceded that the commissioners and their attorneys have conducted the liquidation of the bank.to the best interests of the creditors.
“The attorney for the absent creditors represented about one hundred and twenty-three absent creditors, aggregating about thirty thousand dollars, not eight, aggregating two thousand three hundred and seventeen dollars and fifty-nine cents, as stated in the exhibit annexed to the account. He also represented the unknown owners of certified checks and certificates of deposit for a large amount outstanding at the time the bank failed. He attended the taking of the inventory, signed it, called at the bank every day in the interest of creditors-to see how the liquidation was conducted. He also filed several rules and appeared with the attorneys for the commissioners in the contested rules before the court. His services were necessary for the proper liquidation of the bank, and consequently of service to its creditors.
“ There is no statute in this State fixing the fees of liquidating commissioners of insolvent banks when they are’ appointed by the court on the petition of a creditor.
“ The section of the Revised Statutes, 284, which confers the right upon the creditor to sue a bank for a forfeiture of its charter for *1072 non-compliance with any of its provisions, and upon proof of the fact, authorizes the judge to decree the forfeiture and to appoint commissioners to effect the liquidation, the section under which the proceedings of this suit were instituted, does not mention the fees to be allowed to the commissioner.
“ The section of the Revised Statutes, 294, relied upon by some of the opponents as fixing the compensation, confers the right upon the Attorney General of the State, whenever a note has been protested, in his discretion to apply to the court by petition for a writ of sequestration against all the property of the bank and for judgment of forfeiture, and makes it the duty of the judge, upon proof of the fact,to forfeit the charter and to appoint three liquidators, who, says the statute, ‘ shall receive such compensation as the court may determine, which shall not exceed a salary at the rate of two thousand five hundred dollars per annum.’
“The protested note referred to in this section refers to bank notes circulating as paper money. The section is taken from an act passed in 1858, at a time when the State authorized the banks, upon depositing with the Auditor of the State certain specified securities, to issue bank notes, countersigned by him, as money.
“ The State banks, under the existing laws, do not now issue their notes as money, nor does the Auditor countersign them. The Attorney General has no occasion, on the protest of a note, to apply for the forfeiture of a bank’s charter and the appointment of liquidators. The section is evidently obsolete; If, however, in force and applicable to this case, it does not fix the fees of the liquidators. It places that responsibility upon the court, and at the same time prohibits the court from allowing a sum as compensation for services exceeding a salary at the rate of two thousand five hundred dollars per annum.
“ There being no law upon the subject, the duty is placed upon the court, in the exercise of a legal discretion, to award to the commissioners a reasonable compensation for their services. In this Sbate there is no rule to guide the court in determining what is a reasonable compensation. In the United States Court, where the national banks are liquidated, the compensation is fixed by the Comptroller of the Treasury, generally at a salary of three hundred dollars per month, subject to modification. In New York the compensation, provided in no case it exceeds ten thousand dollars, is fixed by statute at five per cent, on receipts and disbursements. The rule in *1073 other States varies. Where the compensation is not fixed by statute in most of the States, in cases of corporations, the courts are not inclined to allow a percentage on the receipts and disbursements, but prefer, at the end of the liquidation on a final account, to award a specific amount.
“ In some States, in ordinary cases, if the local laws provide a compensation for administrators or executors, the courts will be inclined to grant an allowance on the basis provided by such laws.
“ In one State the rule is what the receiver or some other person possessing equal qualifications could have been employed by private contract to perform the services rendered.
“In Massachusetts the courts do not determine the compensation of receivers upon the basis of a fixed commission upon the amount of money passing through their hands, but allow them such an amount as would be reasonable for the services required of and rendered by a person of ordinary ability, and competent for such duties and services.
“ In Pennsylvania the considerations that are controlling with the court and determine the compensation are ‘ the time and labor needed, not necessarily the time and labor expended, in the proper performance of the duties imposed: the fair value of such time and labor measured by the common business standards; the degree of activity, integrity and dispatch with which the work of the receivership is conducted.’ Gluck and Becker on Receivers, pp. 535-539.
“In awarding a reasonable compensation the court will be guided by the rules adopted by the courts in Massachusetts and Pennsylvania, as they are, in the opinion of the court, in accord with equity and reason.
“ The court can not follow the rule basing the compensation upon the percentage allowed to syndics in individual insolvencies, because the creditors of an insolvent have the right, under the insolvent laws, to select their own syndics, and, if they desire, fix their compensation.
“In this ease, the liquidation of an insolvent bank corporation, the creditor under the law had no voice in the selection of commissioners, and no opportunity to fix their compensation by agreement.
“ The commissioners were engaged three months and one day in a partial liquidation of the bank.
“The clerical work was almost entirely performed by an expert *1074 and clerks. The commissioners thus far have been directed in the way to effect the liquidation by able attotneys, and have acted under their advice. The duties performed by Mr. Bush have been heretofore stated, and, with the exception of giving bond, appearing in court through his attorneys and being responsible, with his co-commissioner, for the .cash and other assets received, were principally advisory, and are similar to those performed by a director in any of the banking institutions in this city. The duties actually performed by Mr. Reynes have also been heretofore stated, and with the same exceptions are similar to those performed by either the president, cashier, receiving teller or discount clerk of the bank before its failure.
“ The president received for his services two thousand eight hundred dollars, and the cashier two thousand one hundred dollars a year, or respectively two hundred and thirty-three dollars and thirty-three and one-third cents and one hundred and seventy-five dollars a month, as stated in argument and not denied.
“ The value of the services of the officers of the bank, and of other banks of the same size, for a year service, together with additional compensation for the further service stated, and for the degree of activity, integrity and dispatch with which their work so far has been conducted, is a common business standard by which the services of the commissioners in this case for a part of the year should be measured.
“ Considering these elements, the law and the evidence, the court is of the opinion that the sum of two thousand dollars is a reasonable compensation for the services of the commissioners herein for the limited time stated.
“ The oppositions are maintained in so far as to reduce the compensation of the commissioners from nine thousand four hundred and eighty seven dollars and thirty-one cents to two thousand dollars.
“ It is conceded, and it is the law, that the responsibility rests upon the court to fix the fees of the attorneys in this case. The responsibility can not be shared with the members of the bar.
“ Judge Martin, in Dorsey vs. His Creditors, 5 N. S., p. 401, and Judge Eustis, in the Succession of McCarthy, 3 A. R., p. 518, have decided, ‘ as the services to be thus compensated are rendered under the eye of the court, the taxation ought to be made on its own *1075 responsibility, which ought not to be shifted from the bench on the bar, as appears to have been done in this case, in which the decision is made on the opinion of the attorneys, that the charge is moderate, and but reasonable.’
" And says Judge Eustis, in the same case: ‘The responsibility of determining the amount of fees for professional services is a matter of great delicacy, and under the rules on which our predecessors and the profession have acted for years, a court in fixing them must be guided by a conscientious estimate of their value.’
“ The courts presided over by Judge Martin and Judge Eustis adopted the following rules: * The measure of the reward of professional services is the exercise of legal knowledge, the responsibility incurred and the labor bestowed.’ The courts which have followed have added to the rule ‘ the professional standing of the attorney.’
‘‘The services rendered by the attorney have been heretofore stated.
“The services rendered in court in obtaining orders from the court were matters of routine, requiring only ordinary professional skill and no great labor. 3 A. R., p. 518.
“ The trial of the rules against the liquidators, the filing of suits on overdrafts and promissory notes, the obtaining of judgments by confession and by default, and in the litigated cases mentioned, required the exertion of ordinary legal knowledge, imposed upon counsel an ordinary amount of labor and responsibility.
“The serious and responsible services performed by counsel were rendered in advising and conducting the liquidation, services rendered out of court. These services required the exertion of a high degree of professional skill, considerable time and labor and imposed upon counsel serious responsibility. They have performed their duty in a most satisfactory manner, and in this respect they are entitled to and have received the highest praise from their opponents at the bar.
“In litigated cases contested in the District and Supreme Courts, where the amount involved depended, in a great measure, upon the legal exertions of counsel, large fees have very properly been allowed, but this is not a case of that character.
“ The judges of the Supreme Court, who perform greater labor and assume heavier responsibilities than the counsel for the liquida *1076 tors in this case, receive for their professional skill and labor five thousand dollars. The District Judges in this city, and those of the Court of Appeals, four thousand dollars a year. The Attorney General of the State three thousand dollars a year. The City Attorney of New Orleans three thousand five hundred dollars a year. The attorneys of the large banks of this city, to the knowledge of the court, for advice, rarely received over one thousand dollars a year.
“ Considering fully every act performed by counsel in this ease, in and out of the courts, and the law and evidence, the court considers five thousand dollars a reasonable fee for their services to date.
“ The oppositions are maintained in so far as to reduce the fees of the attorneys from twelve thousand five hundred dollars to five thousand dollars.
“ The section 1817 of the Revised Statutes, as counsel for the opponents contend, reads: ‘ The fees of the counsellor who shall be appointed to represent the absent creditors shall in no case be paid by the mass of the creditors, but shall be levied on the amount Which shall be recorded for the account of the absent creditors, at the rate of five percent.; provided, that in no case shall the fee exceed the sum of two hundred and fifty dollars.’
“ In the Succession of Auld, 45 A. R., p. 248, the Supreme Court decided that where services of the attorney for absent heirs inured to the benefit of the estate, he was entitled to a larger fee than the two hundred and fifty dollars fixed by statute, and allowed him seven hundred dollars. Ihe court considers under that decision, which it is bound to follow, the attorney for absent creditors in this case is entitled to seven hundred dollars.
“ The oppositions are maintained in so far as to reduce the fee of the attorney for absent creditors from one thousand dollars to seven hundred dollars.
“ The fee of the notary for taking the inventory is fixed by statute. The Act 101 of 1870, Sec. 10, provides ‘That notaries shall be entitled to demand and receive at the time the service may be performed the following fees and no more * * * for making inventories of successions or other property out of office, fifty cents per hour, provided not more than twelve hours per day shall be charged, together with twenty cents per hundred words for the pro-ces verbal of the inventory * * * and twenty-five cents for the certificate and seal thereon.’
*1077 “ The inventory is in the record. It was commenced on the 16th day of September, 1896, and was finished on the 2d day of October, 1896. The notary was occupied sixteen days. Twelve hours a day at fifty cents an hour is six dollars a day, and sixteen days at six dollars a day makes ninety-six dollars. There are fifty-eight pages in the inventory, containing twelve thousand six hundred and three words. Adding ninety-seven words to cover any possible error in the count, the number of words are twelve thousand seven hundred, which, at twenty cents per hundred, amounts to twenty-five dollars and forty cents. The charge for the certificate and seal is twenty-five cents. There is r.o evidence in the record of any other service' upon which the court can fix a charge. The right is reserved to the notary to establish hereafter and charge for whatever servipes he has rendered other than taking the inventory herein.
“ The oppositions are maintained in so far as to reduce the fees of the notary from seven hundred and fifty dollars to one hundred and twenty-one dollars and sixty-five cents.
“The appraisers left their compensation to be fixed by the commissioners and their attorneys. The syndics have placed them upon the account for two hundred and fifty dollars each, five hundred dollars. Their fee under the law is fixed by the court, not by statute, as in the case of successions. 39 A. R., p. 397.
“ Considering the evidence the court is of the opinion that the appraisers are entitled to fifty dollars each, one hundred dollars.
“ The oppositions are maintained in so far as to reduce the fees of the appraisers from five hundred dollars to one hundred dollars.” '
For the foregoing reasons the judgment appealed from is affirmed.
The Chief Justice recuses himself in this case.