### SPREMICH v. SOMERFIELD et al.

#### No. 16254.

Court of Appeal of Louisiana. Orleans.

March 23, 1936.

Bentley Byrnes and Frederic C. Querens, both of New Orleans, for appellant.

Racivitch & Hickerson, of New Orleans, for appellee.

JANVIER, Judge.

On November 6, 1933, Nicholas Spremich leased to Mrs. Sadie C. Somerfield a building known as the Plaza Hotel in the city of New Orleans. The lease, though it was executed on November 6, 1933, contained a stipulation that it had gone into effect on November 1st. Under its terms Mrs. Somerfield agreed to pay monthly, in advance, $170 for each of the two remaining months of 1933, and $150 monthly, in advance, for each month of the years 1934 and 1935, and it was also stipulated that in the event of default in the payment of any note, the remaining unpaid notes should automatically become due.

Spremich, the landlord, alleging that the note for $150 due on January 1, 1934, had not been paid, and that as a result the remaining notes had matured, filed this suit against the lessee, Mrs. Somerfield, seeking judgment for the full amount, to wit, $3,600, with interest and attorney's fees as stipulated in the lease.

He prayed for recognition of his lessor's lien on all of the effects of the lessor contained in the premises, and he obtained a writ of provisional seizure under which the said effects were seized.

Mrs. Somerfield filed an answer which plaintiff construed as containing admissions which entitled him to judgment, and, therefore, by rule nisi, he called upon her to show cause why judgment should not be rendered as prayed for by him. This rule was made absolute, judgment was rendered in accordance with the prayer of the petition, and defendant, Mrs. Somerfield, has not appealed.

Thereupon, Spremich, in execution of the judgment and in addition to the seizure which had resulted from the writ of provisional seizure, caused the issuance of a writ of fieri facias and under it issued garnishment process against the American Bank & Trust Company requiring that corporation to declare whether in its possession there were any funds of the said Mrs. Somerfield. The said bank answered that there was on deposit with it an amount slightly in excess of $500; that Mrs. Somerfield had sent to the said bank previously a letter requesting that on January 5, 1934, it pay to Wesley

D. Burdine $500 out of the said deposit; that on December 21, 1933, Mrs. Somerfield had notified the said bank that she had canceled the said authorization, and that it, the said bank, could not tell whether it should deliver the $500 to Burdine under the first said order, or to the sheriff under the writ of fieri facias, and it further stated that it would hold the said sum either "subject to an agreement between the parties, or a judicial determination of this dispute."

At this stage of the proceeding Wesley D. Burdine intervened and claimed that he had sold to Mrs. Spremich the effects which had been contained in the premises and which had been seized under the writ of provisional seizure, and that he had retained a vendor's lien and obtained a chattel mortgage to secure the payment of the unpaid portion of the purchase price, and that, though his chattel mortgage had not been recorded in the mortgage office until after the date of the lease, nevertheless, the lien resulting from the chattel mortgage should be given priority over that of the lessor for various reasons which we shall hereafter set forth and discuss.

Burdine also claimed that Mrs. Somerfield had assigned to him, prior to its seizure at the hands of the lessor and judgment creditor, a certain $500 portion of the deposit standing in her name at the American Bank & Trust Company, and that, as a result of this alleged prior assignment, he should be placed in possession of the said sum.

In the absence of an appeal by Mrs. Somerfield, the controversy, so far as the effects which were in the premises are concerned, resolves itself into a contest between the lessor of the building and the holder of a chattel mortgage on property found in the building and seized at the instance of the lessor, and, so far as the $500 deposit is concerned, the controversy depends upon whether the order, which Mrs. Somerfield gave to the bank to pay at a future date a certain portion of her funds to some one else, might be canceled by her prior to the date fixed for its execution.

Both of these questions were decided by the district court adversely to Burdine, and he has appealed.

We consider first whether the record authorizes us to hold that the lien resulting from the chattel mortgage held by Burdine, which mortgage was not recorded until aft-

er the execution of the lease, should have priority over the lien of the lessor resulting from the execution of the lease.

Conceding that the lien of the lessor on articles in the leased premises ordinarily takes precedence over the lien of a chattel mortgage recorded after the execution of the lease, Burdine contends that here the actions of the lessor were such as to amount to fraud and coercion, and that, as a result of those actions, the recordation of the chattel mortgage was permitted to be delayed; that he, Burdine, was coerced into withholding the chattel mortgage from recordation until after the lease had been executed, and that, therefore, so far as Spremich and his lessor's lien are concerned, the lien of the chattel mortgage should be considered as having attached at the time at which it would have attached had the recordation not been delayed.

We must, therefore, consider the facts and circumstances surrounding the execution of the lease and of the chattel mortgage. During the month of October, 1933, Burdine occupied the premises under a lease from Spremich, under which he was required to pay in advance a monthly rental of $170. This lease would have expired on December 31, 1933. It contained a stipulation giving Burdine the right to renew it for an additional term of from one to four years at the same rental, to wit, $170 per month payable in advance.

At that time there were located in the leased premises certain articles of furniture and hotel paraphernalia which belonged to Burdine. Concluding that he did not care to renew the lease, he prevailed upon Mrs. Somerfield, who was interested in leasing the premises from Spremich, to purchase from him the furniture and other hotel effects to which we have referred.

He alleges that Spremich, the landlord, was aware of and verbally assented to this transaction and agreed that Mrs. Somerfield might lease the premises from January 1, 1934, for two years at $150 per month, and that the sale and chattel mortgage involving the furniture might be executed and recorded prior to the commencement of the new lease. In other words, that the lessor consented that the chattel mortgage to be executed might, by reason of prior execution and recordation have precedence over the lessor's lien which would result from the lease which was later to be executed.

Burdine further charges that he and Mrs. Somerfield and Spremich, during the early part of November, 1933, agreed that Mrs. Somerfield should take over the premises at once and that she should then become the tenant for the remaining portion of November and for the month of December, 1933, but that when Spremich was called upon to execute the necessary documents to give effect to these various verbal agreements, he refused to do so except upon condition that he be paid $480 in cash, and that the chattel mortgage be withheld from recordation until after the execution of the lease and also unless the lease, which was to include the remaining portion of 1933 and the two following years though dated November 6th, should contain a stipulation making it effective as of November 1, 1933. Spremich denies that, at any time, he agreed that priority should be accorded to the chattel mortgage or that it might be executed and recorded prior to the execution of his lease, and he maintains that he would not have considered the granting of a lease to Mrs. Somerfield had he known that the furniture and effects which she was to use in the premises and which he looked to as security for his rent money were to be subject to a pre-existing lien of a vendor or of a mortgage creditor. He states that when it was proposed to him that he permit Mrs. Somerfield to take over the property at a smaller rental than Burdine had been paying, he refused to do so unless he should be paid the difference in cash, and that this difference for the two-year term would have been $480, and that when he heard that the chattel mortgage had been executed or was about to be executed he demanded that it be not recorded until after the execution of his lease. He further states that later he was prevailed upon to reduce the demand for $480 to $280, and that he agreed to this, and that when Burdine was unable to pay the $280 in cash, he agreed to accept an order for $280 of the amount for which Mrs. Somerfield had already given to the American Bank & Truck Company an order payable January 5, 1934.

At that time Burdine had already paid the rent for November, which was due in advance, and the attorneys for Spremich felt that the lien which would result from the lease to Mrs. Somerfield might not attach until December 1st, because of the payment by Burdine of the rent for November, and they required that Burdine be credited

with the amount which he had paid and that note be destroyed and that a new note be executed by Mrs. Somerfield and then be paid and canceled so that it would appear to all parties that Mrs. Somerfield and not Burdine was the lessee for the month of November. It further appears that the attorneys for Spremich demanded that the chattel mortgage be not recorded until after the execution of the lease. As a matter of fact, the lease, executed on November 6th, was made effective, by its terms, November 1st, and the chattel mortgage was not recorded until November 7, 1933.

· Counsel for Spremich testified that these requirements were made by them and that the parties agreed thereto, and that it was well understood by all that the purpose of the transaction was that there might be no possibility that the landlord's lien should not be given priority over that which would result from the recordation of the chattel mortgage.

At that time, November 6th, counsel for Burdine, the present intervener, in his own hand, wrote on the lease which had previously been held by his client, the following:

"New Orleans, November 6/33

"By mutual agreement between the lessor, Nicholas Spremich and lessee, W. D. Burdine, the within lease (being a copy of the original) is hereby cancelled as of October 31, 1933, the premises being leased from November 1, 1933 to a Mrs. S. G. Somerfield."

The record shows conclusively that during all of these negotiations Burdine was represented by counsel who was present during the entire transaction and was familiar with all the details. There appears in the record no single fact indicative of fraud or undue restraint or coercion on the part of Spremich or of his attorneys. Spremich obviously was unwilling to lease his building to a person without any unincumbered effects or property of her own, and though he did desire a tenant, he was justified in insisting that the property put into the building by the tenant and used by her in the hotel business be subject to his lessor's lien.

Burdine, on the other hand, was the owner of furniture which he desired to sell. He knew that its value, if removed from the hotel premises, would be very much reduced. That its value, if removed, would have been reduced is evidence by the price which it brought only a few months later.

He was plainly interested in having Mrs. Somerfield obtain the lease from Spremich because, unless she did so, she would have had no use for his furniture and would not have bought it. These considerations prompted him to agree to the terms made by Spremich. He did agree to them, and he must be bound by them.

Counsel for Burdine rely upon the case of Hardie et al. v. Wright et al., 12 La.App. 52, 125 So. 312, 314, the facts of which appear to be properly stated in their brief, as follows: "A Mrs. Hickox signed a lease on Jul 22nd to begin October 1, 1922, at a time when a Mrs. Mallon was the tenant under a lease expiring September 30, 1922. Mrs. Mallon sold the contents to Mrs. Hickox, who succeeded her, the goods remaining in the premises. On September 5, 1922, Mrs. Hickox made a chattel mortgage on the goods still in the premises and the same was recorded prior to the time her lease would begin in effect, or would begin to run. The landlord in that case endeavored to urge that his lease began in effect from the time the lease was made."

The court said: "The fact that she subsequently became a tenant could not have retroactive effect. It is true that when she granted the chattel mortgage she had contracted to occupy the place as a tenant, thus indicating her intention to create the relation of landlord and tenant. But the landlord's lien is not created by intention, nor by contract. * * * In other words, it is not competent for individuals to stipulate that a lease shall begin at some time in the future and the landlord's lien shall have effect immediately."

But that is not the situation here, for here the landlord or the prospective landlord stated to the tenant and to the prospective mortgage holder that he would not make the lease unless the mortgage was withheld until after the commencement of the lease, and by agreement of all the parties this was done.

The cases cited by counsel which involve acts resulting from threats or actual coercion have no application.

Article 1851 of the Civil Code provides: "It is not every degree of violence or every kind of threats that will invalidate a contract; they must be such as would naturally operate on a person of ordinary firmness, and inspire a just fear of great injury to person, reputation or fortune. The age, sex, state of health, temper and disposition

of the party, and other circumstances calculated to give greater or less effect to the violence or threats, must be taken into consideration."

And in Civ.Code, art. 1856, we find: "If the violence used be only a legal constraint, or the threats only of doing that which the party using them had a right to do, they shall not invalidate the contract. · A just and legal imprisonment, or threats of any measure authorized by law and by the circumstances of the case, are of this description."

The attorney for Burdine stated: "When I first went to the office of Mr. Denechaud on November 6th, and had been informed what the conditions would be for the lease to Mrs. Somerfield * * * I informed Mr. Burdine of what the general conditions would be and what the program was for us to go through with, and Mr. Burdine told me that he was not in favor of having to do it, that he would do it. * * *"

Spremich was within his rights in refusing to enter into the new lease except upon terms dictated by him. Those terms may have been harsh, but, if so, that is of no importance. Burdine understood them and, with his counsel present, accepted them.

In the evidence given by his counsel appears the following colloquy between the counsel and the district judge:

"Q. Wasn't it perfectly plain that he (counsel for Spremich) wanted to subordinate the chattel mortgage to the landlord's claim? A. I can understand perfectly. * * *

"Q. That seems to be the whole case here. A. I did not specifically agree to it. I told him that would have to take care of itself.

"Q. In other words, you were just using a subterfuge? You agreed to it, but you wanted to hold an ace in the hole and come back and say you made a protest? * * *"

We quite agree with our brother below.

Since the lease was executed before the recordation of the chattel mortgage and there· was no fraud, duress, or coercion, there can be no doubt of the priority of the lien of the lessor.

The statute, under which the chattel mortgage was executed, Act No. 198 of 1918, provides: "Every mortgage shall be a lien on the property mortgaged from the time same is filed for recordation, which filing shall be notice to all parties of the existence of such mortgage, and said lien shall be superior in rank to any privilege or lien arising subsequently thereto." Section 4.

In interpreting this article, in Murov v. Marks Meyer, 2 La.App. 756, the court said:

"Under the authority of the case of Youree v. Limerick, 157 La. 39, 101 So. 864, [37 A.L.R. 394], counsel say that plaintiff's privilege under this chattel mortgage primes the lessor's privilege by virtue of the fact that the chattel mortgage was executed three days prior to the date on which defendant's lessor's privilege arose; the mortgaged furniture not having been moved into defendant's home until June 16, 1921.

"This would undoubtedly be true if plaintiff's chattel mortgage had been filed and recorded prior to the date on which the furniture went into defendant's house. But according to the certificate of the deputy recorder the chattel mortgage was filed and recorded on June 17, 1921—the day after the furniture was carried into the leased premises." ·

See, also, Weiss v. Hudson Const. Co., 151 La. 1, 91 So. 525; Gulf Finance Co. v. Taylor, 160 La. 945, 107 So. 705; Krivos v. Simmons, 16 La.App. 421, 134 So. 727; Charrier v. Greenlaw Truck & Tractor Co., 2 La.App. 622; Booth Motor Co. ·v. Gamburg, 9 La.App. 60, 118 So. 854.

There remains for consideration the effect to be given to the letter written by Mrs. Somerfield on October 30, 1933, to the American Bank & Trust Company in which she directed the bank to pay on January 5, 1934, $500 to Burdine. The letter reads as follows:

"You have on deposit in the Savings Department of your bank in the name of Mrs. Sadie G. Somerfield, the undersigned, a savings deposit account bearing the No. 35902.

"In view of the fact that I have contracted certain obligations for certain purposes, it becomes necessary for me to eventually transfer, as part of said fund, to Mr. Wesley D. Burdine of this city, the sum of $500.00 from said deposit account, and on January 5, 1934 you are hereby authorized to pay to Mr. Burdine the sum of $500.00 out of said deposit account, without any further claim on my part thereafter against the said amount accordingly, and you are authorized to issue in the interim, if you desire, any formal certificate or letter necessary to Mr. Burdine to carry the payment into operation for that date."

On December 21, 1933, Mrs. Somerfield, through her attorney, wrote another letter to the bank in which she "withdrew" the authority to pay the money to Burdine. If she was within her rights in withdrawing the authority, then the said fund belonged to her at the time it was seized; if not, it belonged to Burdine, and the seizure, so far as that fund is concerned, must be dissolved.

It is contended by Burdine that the first letter constituted an assignment which could not be subsequently canceled. He relies on articles 2642, 2643 and 1909 of our Civil Code, which read as follows:

Article 2642. "In the transfer of credits, rights or claims to a third person, the delivery takes place between the transferer and transferee by the giving of the title."

Article 2643. "The transferee is only possessed, as it regards third persons, after notice has been given to the debtor of the transfer having taken place.

"The transferee may nevertheless become possessed by the acceptance of the transfer by the debtor in an authentic act."

Article 1909. "If the obligation be to deliver an object which is particularly specified, it is perfect by the mere consent of the parties. It renders the creditor the owner, and although it be not delivered to him, puts the thing at his risk from the date of the obligation, if the contract is one of those that purport a transfer."

Spremich, on the other hand, maintains that the respective rights of the parties are controlled by the Negotiable Instrument Law of Louisiana, Act No. 64 of 1904, and particularly by section 189 thereof, which reads as follows: "A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check."

In Feitel House Wrecking Co. v. Citizens' Bank & Trust Company, 159 La. 752, 106 So. 292, 294, our Supreme Court, in referring to the effect of the above quoted article, said: "Hence it appears that, since the passage of the Negotiable Instruments Law, the law in this state is that, until a check has been accepted or certified by the drawee bank, it does not operate as an assignment of any part of the funds of the drawer in the bank, although the bank may have been notified of the drawing of the check, and hence, unless the check has been accepted or certified by the bank, there is no privity between the bank and the holder, and therefore the holder has no cause of action against the bank."

Prior to the passage of the Negotiable Instruments Law the rule was different and a bank, which had been notified that a check had been drawn against a fund on deposit with it, became liable to the holder.

That the Negotiable Instruments Law has made this change is recognized in Feitel House Wrecking Co. v. Citizens' Bank & Trust Co., supra, in which the Supreme Court, in referring to decisions rendered in earlier cases in State ex rel. St. Amand v. Bank of Commerce, 49 La.Ann. 1060, 22 So. 207, and in Gordon & Gomila v. Muchler, 34 La.Ann. 604, said that at the time these decisions were rendered the rule was: "If the bank has been notified that the check has been drawn, although it has not accepted the check, a cause of action arises in favor of the holder against the drawee, assuming that the drawer has sufficient funds in the bank to meet the check at the time the notice is given."

We construe the first letter of Mrs. Somerfield as having the effect of a check, except that it required payment to be paid in the future. It was nothing more than an order on the bank to pay on a certain date a certain sum to a person named. When the bank received that letter it did not pledge itself in any way to make payment to him. It did not set aside any part of the fund. It would have been required to make such payment on the date fixed in the order if, on that day, there were funds out of which it might be paid and if the order remained unrevoked until that time.

That this is the rule generally accepted by banking institutions who must frequently have occasion to apply the rule is evidenced by the following language from a volume entitled "Negotiable Instruments," issued by the American Institute of Banking: "May the drawer of a check, without any good reason, arbitrarily stop payment of his check? Must the bank obey his instructions without questioning his motives? Since the check is only an order on and authority to the bank to pay, the customer has the right to revoke such authority and countermand the check. After receiving a stop-payment notice, the bank will pay the check at its peril. It is its duty to obey the instructions and refuse to pay. In such event it is under no liability to the holder, whose sole recourse is against the drawer

and any prior indorsers. The drawer has this power of countermand irrespective of any fraud or misrepresentation, and the bank is under no duty to inquire into his motive. As between the bank and the customer, the latter has the right to· revoke the bank's authority to pay, and it is the bank's duty to obey his instruction."

That the· letter was not in the form usually employed when orders are issued to banks to make payment is of no importance whatever. The date of its issuance, the signature of the depositor or drawer, the name of the holder and the date on which it is to be paid are set forth. It was just such an order as is given by check and until the time for payment arrived the authority given could, at any time, be withdrawn. Whether as between the drawer and the holder there was just cause for "the stop payment order" is no concern of the bank. The fund, so far as it is concerned, belongs as fully and completely to the depositor as if no such order for payment had even been issued.

On this feature of the matter also the judgment rendered below was correct.

For the reasons given, it is ordered, adjudged, and decreed that the judgment 'appealed from signed on July 12, 1935, be, and it. is, affirmed, at the cost of intervener, appellant.

Affirmed.·